RELIGIOUS TECHNOLOGY CENTER,
a California non-profit corporation,
Plaintiff,

v.

F.A.C.T.NET, INC., a Colorado corporation; Lawrence Wollersheim, an individual; and Robert Penny, an individual,
Defendants.

Civ. A. No. 95–B–2143.

United States District Court,
D. Colorado.

Sept. 15, 1995.

Todd P. Blakely, Denver, CO, Helena K. Kobrin, North Hollywood, CA, Earle Cooley, Boston, MA, for Plaintiff.

Thomas B. Kelley, Natalie Hanlon–Leh, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

On August 21, 1995 Religious Technology Center ("RTC"), a California non-profit corporation, filed a verified complaint against Lawrence Wollersheim, Robert Penny and F.A.C.T.NET, Inc. ("FACTNET") for injunctive relief and damages for copyright infringement (17 U.S.C. § 501) and trade secrets misappropriation (Colo.Rev.Stat. § 7–74–102 to –110 (1986)).

Jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a) and (b) in that this is an action for copyright infringement under 17 U.S.C. § 501. Supplemental jurisdiction exists under 28 U.S.C. § 1367 over the trade secrets misappropriation claim, which RTC alleges arises out of the same transaction and occurrences.

Before me is RTC's motion for preliminary injunction.

### I. *Background.*

RTC is one of the formal entities constituting the Church of Scientology (the "Church") founded by L. Ron Hubbard. FACTNET is a non-profit educational and charitable corporation registered and with its principal place of business in Colorado. Wollersheim and Penny are former Scientologists.[1] Wollersheim serves as President of the Board and Executive Director of FACTNET and Penny is a member of the FACTNET Board.

Defendants, operating on minimal financial resources, maintain a library and archive information concerning, *inter alia,* an ongoing public controversy regarding the Church's status as a religious tax exempt organization and charges that its practices involve harmful psychological coercion which has resulted in mental and physical harm to a significant number of its adherents.

Much of the information maintained by Defendants is made available publicly on FACTNET's Bulletin Board Service on the international computer network known as the Internet.[2] Other data is stored in a private portion of the FACTNET library which includes information concerning and provided by former Scientologists and their families.

RTC alleges Defendants have placed on the Internet unauthorized copies of unpublished religious works called OT materials, often referred to as "Advanced Technology." They list the materials in issue ("the Works") in Exhibit "A" to the complaint.

RTC maintains it has the exclusive license to the Works. It asserts the materials consist of unpublished works of L. Ron Hubbard, the founder of the Church of Scientology. The Church only permits access to each of the works to members who have attained the proper level of spiritual enlightenment and made the requisite financial contributions. Such access is through a highly controlled system known as "auditing" involving

---

1. The Church of Scientology and Wollersheim have opposed each other in litigation in various cases. In *Wollersheim v. Church of Scientology,* (Cal.Ct.App.1992), an action in which Wollersheim alleged intentional and negligent infliction of emotional injury, the court affirmed its prior judgment in his favor as to the cause of action for intentional infliction with the exception of the $30 million damage award which it reduced to $500,000 for compensatory damage and $2 million for punitive damages. A final judgment which the evidence discloses remains unpaid.

2. A bulletin board service ("BBS") usually requires users to dial in through telephone lines to access specialized information or services.

supervision by a senior member of the Church. RTC claims the Works are available at only seven sites around the world and are never removed from these locations.

Defendants maintain any of the Works in its possession were obtained lawfully and are maintained in the non-public section of Defendants' library. Wollersheim has provided consulting services to lawyers representing clients in litigation involving the Church but denied making copies of the Works for this purpose. Defendants assert they have not posted any of the Works to the Internet for public availability and that it is their policy not to do so.

According to Wollersheim, the only deviation from this policy was between August 1 and August 3, 1995, when, due to miscommunication, Arnold P. Lerma, a FACTNET director posted some of the Works to the Internet. The portions of the Works published by Lerma had been part of an unsealed public court record in the Central District of California in *Church of Scientology International v. Fishman*, No. CV 91–6426 HLH (Tx) C.D.Cal.[3] These materials were attached to an affidavit filed by Fishman in that case. Wollersheim testified he received a copy of the affidavit from Fishman's counsel in the course of the consulting services Wollersheim provided in that case.

On August 15, 1995, Defendants posted a message to a newsgroup on the Internet claiming Lerma had acted on their behalf and with their endorsement and that they stood behind his actions.

## II. *Procedural History.*

On August 21, 1995, Judge Babcock, ruling on *ex parte* motions, granted a temporary restraining order against Defendants. His order restrained Defendants from the unauthorized copying, use or reproduction of the Works identified in Exhibit "A" to the complaint or any other part of the works that are part of the Advanced Technology, in particular the copying into "any computer data base, information service, storage facility, archives, or other computerized network or facility." The order further restrained the destruction or concealing by Defendants of such Works in their possession. It also required RTC to file a bond in the amount of $10,000 with the court forthwith. Judge Babcock set a hearing for a preliminary injunction before me on August 25, 1995 due to his being unavailable on that date.

Judge Babcock ordered Defendants to deliver the infringing articles within their possession and control into the custody of RTC's counsel. In this regard, he issued a writ of seizure and ordered a portion of the court file sealed until execution of the writ of seizure. Judge Babcock also granted RTC's motion for expedited discovery, ordering the depositions of all three Defendants to take place on August 23, 1995.

On August 22, 1995, extensive materials, including computer equipment, computer software and voluminous documents were seized from Defendants' premises pursuant to the writ. They were placed in the custody of RTC's counsel who proceeded to search for allegedly infringing materials.

On August 23, 1995, Defendants filed motions for a protective order, for temporary stay of expedited discovery and to require immediate delivery of confidential, proprietary, and privileged documents belonging to Defendants to their counsel of record, Thomas B. Kelley. RTC filed an opposition to the motion for a stay.

On August 24, 1995 I ordered an extension of the time for taking the depositions of Defendants and an extension of the restraining order until September 8, 1995 when the preliminary injunction hearing commenced. On August 25, 1995 I ordered Defendant's counsel or his representative be allowed to be present while Plaintiff's counsel searched

---

**3.** On August 11, 1995, RTC sued Lerma in the United States District Court for the Eastern District of Virginia for copyright infringement and trade secret misappropriation in *Religious Technology Center v. Lerma*, 897 F.Supp. 260 (E.D.Va. 1995). On August 11, 1995, RTC obtained a restraining order and order of seizure and impoundment against Lerma. On August 22, 1995,

RTC amended its complaint in that case, adding the Washington Post and two of its reporters as defendants. On August 30, 1995, that court denied RTC's motion seeking to enjoin the Post defendants from copying, disclosing, using, displaying, or reproducing Advanced Technology materials which it had obtained from the same public court file.

the impounded evidence. I further ordered any items to which Defendants might claim privilege to be segregated from the materials impounded and handed over to the court.

The preliminary injunction hearing took place before me on September 8, 11, and 12, 1995. At the termination thereof, I issued an oral ruling. I denied RTC's request for a preliminary injunction and ordered RTC to return and restore to the Defendants all seized materials. I ordered Defendants to maintain the status quo as to the possession of all copyrighted materials at issue in the case and restricted each of Defendants to making only fair use of the materials. I reserved the right to clarify my oral order by way of a written opinion. This is that opinion.

### III. *Preliminary Injunction.*

I have authority to issue a preliminary injunction under Federal Rule of Civil Procedure 65. In addition, the Copyright Act specifically authorizes me to grant a preliminary injunction "on such terms as [I] may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502. The Colorado Uniform Trade Secrets Act similarly grants me the power to grant injunctive relief "to prevent or restrain actual or threatened misappropriation of a trade secret."

A preliminary injunction is an extraordinary remedy providing the potential for considerable harm yet its emergency nature does not afford the court the usual degree of careful consideration afforded by the deliberative processes of a trial. As a consequence, the issuance of such an injunction, like the power of contempt, is one which is at best used sparingly, if at all.

Moreover, the very purpose of an injunction is to preserve the *status quo ante.* That is a rather elegant piece of Latin which means the last existing state of peaceable, noncontested conditions which preceded the pending controversy. I will not dwell on this, but it is helpful to observe that our legal forefathers were not fools; the complete phrase is *status quo ante bellum* which literally means "the state of things before the war began."

Given this purpose and the caution the law prescribes there are four basic considerations or findings which must be made before an injunction can issue. These same four factors likewise assist in determining the scope of the injunction and the conditions which attach to it.

A party seeking injunctive relief must establish:

(1) it will suffer irreparable injury unless the injunction issues;

(2) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;

(3) the injunction would not be adverse to the public interest; and

(4) substantial likelihood that the movant will eventually prevail on the merits.

*Walmer v. United States Dep't of Defense,* 52 F.3d 851, 854 (10th Cir.1995). The Tenth Circuit has adopted a modified interpretation of the fourth "likelihood of success" element. *Id.* "If the movant has satisfied the first three requirements for a preliminary injunction, the movant may establish likelihood of success by showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberative investigation." *Id.* This modified test applies, however, only where the first three requirements are satisfied.

Similarly, the less rigorous test for injunctive relief sometimes employed in copyright cases is only applicable where the plaintiff has made a prima facie showing of infringement. *See, e.g., Financial Control Assoc's v. Equity Builders, Inc.,* 799 F.Supp. 1103, 1113 (D.Kan.1992); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06[A] (1995).

The circumstances of this case warrant consideration and balancing of all four factors.

### A. *Substantial Likelihood of Success on the Merits.*

#### 1. *Copyright Infringement Claim.*

RTC contends it will succeed on the merits of its claims for copyright infringement be-

cause it owns a valid copyright and the copyrighted work was copied by Defendants without its authorization.

■ To prevail in a copyright infringement action, a plaintiff must prove (1) ownership of a valid copyright and (2) defendant copied, "protected components of the copyrighted material." *Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 9 F.3d 823, 831 (10th Cir.1993). If a certificate of registration in accordance with 17 U.S.C. § 410(c) has been obtained, there is a presumption in favor of the plaintiff that a valid copyright exists. *Id.* at 832. The defendant then has the burden of overcoming this presumption. *Id.*

RTC claims it has certificates of registration for the Works, is their exclusive licensee and is entitled to protect them as if it were the original holder of the copyrights. At the outset of the preliminary injunction hearing, Defendants' counsel stipulated only for the purposes of this proceeding that the Works were originated by L. Ron Hubbard and that RTC has a valid title to the copyright in the Works.

■ Once a plaintiff shows it holds a valid copyright, it must then prove the defendant unlawfully appropriated some protected portions of the copyrighted work at issue. *Id.* This question breaks down into two separate inquiries:

1) [W]hether the defendant, as a factual matter, copied portions of the plaintiff's [writings]; and 2) whether, as a mixed issue of fact and law, those elements of the [writings] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.

*Id.* In *Gates Rubber* the court noted that the inquiry does not end with a finding that the defendant copied the plaintiff's materials. "Liability for copyright infringement will only attach where protected elements of a copyrighted work are copied." *Id.* at 833. The Copyright Act provides:

In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b). The 1976 House Report noted copyright protection does not preclude others from using the ideas or information revealed by the author's work, rather it refers only to the expression of the work adopted by the author. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 57 (1976), reprinted in 17 U.S.C.A. § 102 app. at 17 (1976)).

■ RTC asserts Defendants themselves and through others directly copied the copyrighted Works. It maintains Defendants duplicated portions of the Advanced Technology materials onto a newsgroup [4] on the Internet and onto a Web site,[5] making them accessible to Internet subscribers. These subscribers could then download the works onto their own computers and have personal copies.

RTC additionally claims Defendants provided Arnaldo Lerma with copies of the materials at issue. Lerma ultimately posted these copies onto the Internet. RTC claims the act of providing Lerma with the copies constitutes contributory copyright infringement.

The evidence showed, however, that, apart from the Lerma posting, the only copying of the Works by Defendants was scanning them onto their computer and placing them in the private section of their library without making them available to the public over the Internet or otherwise. Copying of this sort by Defendants falls within the well established limitation on the exclusive right of copyright ownership recognized in the Copyright Act, 17 U.S.C. § 107.

Under this limitation, "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research, is not an in-

---

**4.** A "newsgroup" is an electronic discussion group, serving as a bulletin board for users to post universally accessible messages, and to read and reply to those from others.

**5.** World Wide Web is a network of computers on the Internet that maintains documents users can read and transfer with a number of programs.

fringement of copyright." 17 U.S.C.A. § 107. The Copyright Act lists four factors for consideration in determining whether a particular use made of a work is fair use:

> (1) the purpose and character of the use, including whether such use is of commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*

■ "Fair use" is a factual determination. *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 549, 105 S.Ct. 2218, 2224–25, 85 L.Ed.2d 588 (1985). Each fact must be assessed in light of the total circumstances of the case and then a conclusion can be made as to whether the doctrine applies.

In *Harper & Row,* a magazine editor obtained a copy of a copyrighted manuscript which he knew he was not authorized to publish. In an attempt to get a "scoop" on the magazine that had the rights to publish the piece, he published excerpts from it. The Court found for the copyright holders, determining on a factor by factor basis that there was no valid fair use on the part of the defendant. The Court held the questioned publication's effect on the market is the "single most important element of fair use." *Id.* at 566, 105 S.Ct. at 2233.

Even if, as RTC maintains, the Works have not been published, the concerns of the Court in *Harper & Row* do not apply here. Defendants' use of the materials was not with the intention of depriving the planned publication of its full impact. Further, no evidence was presented as to the effect of the Defendants' copying of the Works upon the potential market for them.[6]

The evidence showed the Works are esoteric in nature and are delivered to certain followers by advanced Scientologists known as "auditors" as part of an elaborate system of instruction. The only financial harm RTC would suffer would be if followers were to forsake the Church's didactic methodology in favor of self instruction through the Works copied by Defendants. There was no suggestion, let alone evidence, of this potential for financial loss to the Church.[7]

The alleged copying by the Defendants was not of a commercial nature. Rather, it was made for non-profit purposes to advance understanding of issues concerning the Church which are the subject of ongoing public controversy.

■ RTC has not introduced the Works in their entirety into evidence to enable comparison of the amount and substantiality of the portion of the Works copied with each copyrighted work as a whole. Notably, however, even if a work is introduced in its entirety, the copying may nevertheless constitute fair use. *See, e.g., Sony Corp. v. Universal City Studios,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574, *reh'g denied,* 465 U.S. 1112, 104 S.Ct. 1619, 80 L.Ed.2d 148 (1984); *Rotbart v. O'Dwyer Co.,* 34 U.S.P.Q.2d 1085 (S.D.N.Y.1995).

---

6. This case is distinguishable from *Bridge Publications, Inc. v. Vien,* 827 F.Supp. 629 (S.D.Cal. 1993), *appeal reinstated and transferred,* 53 F.3d 344 (Fed.Cir. (Cal.) 1994). The *Vien* court held there was a copyright infringement and fair use did not apply. In that case, as here, an affiliate of the Church sued to enjoin the use of copyrighted works. There, however, the defendants were charging for classes that used the documents as part of their study. *Id.* at 632. The court found defendants used the materials for the same purposes as the holders of the copyright. *Id.* at 635. The court also found that there was a wholesale copying of the work and that this weighed heavily against fair use. *Id.* at 636. Finally, the *Vien* court found that because the defendant's use of

the materials was substantially similar to that of the Church, there was an economic harm as demand for sale or distribution from the Church would diminish. *Id.*

7. An argument that RTC may be harmed financially by Defendants' intended criticism of the Works through copying would not prevail. In a similar case, the Second Circuit ruled that economic harm from criticism is not actionable under copyright laws. *New Era Publications Int'l v. Carol Publishing Group,* 904 F.2d 152, 160 (2nd Cir.), *cert. denied,* 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990).

Defendants maintain and the evidence does not refute that the Lerma postings to the Internet were made in the context of ongoing dialogue in the particular newsgroup to which they were posted. They form part of the topical debate concerning whether the Works are of substance or are perpetuated as part of systemic mind control.

No evidence was introduced showing a likelihood that a follower of the Church would consider the postings by Lerma as a market substitute for the Works. Nor did the evidence show that the postings were of a commercial nature or had any effect on the potential market for the works. As such, the postings may well be considered as having been made for the purposes of criticism, comment or research falling within the fair use doctrine.

At this preliminary stage of proceedings, I find RTC has not shown a substantial likelihood of success on the merits of its copyright claim.

### 2. *Misappropriation of Trade Secrets Claim.*

RTC claims Defendants have misappropriated its trade secrets by acquiring, disclosing and using portions of the Works without authorization. Such claim is governed by the Colorado Uniform Trade Secrets Act and is not preempted by federal copyright statutes. *See Gates Rubber,* 9 F.3d at 846–47.

Colorado defines trade secrets as:

[T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession, which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo.Rev.Stat. § 7–74–102(4) (1986).

What constitutes a trade secret is a question of fact for the trial court. *Gates Rubber,* 9 F.3d at 848. Colorado courts apply a number of factors in determining whether a trade secret exists. They include:

1) the extent to which the information is known outside the business;

2) the extent to which it is known to those inside the business, i.e., by the employees;

3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

4) the savings effected and the value to the holder in having the information as against competitors;

5) the amount of effort or money expended in obtaining and developing the information; and

6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Colorado Supply Co., Inc. v. Stewart,* 797 P.2d 1303, 1306 (Colo.App.1990), *cert. denied,* Oct. 7, 1991.

Despite RTC and the Church's elaborate and ardent measures to maintain the secrecy of the Works, they have come into the public domain by numerous means. RTC's assertion that the only way in which the materials have escaped its control was through two thefts in Denmark and England was not supported by the evidence. A former senior Scientology official testified to ongoing difficulties the Church incurred in keeping the Works secret, including members losing materials in their possession. The evidence also showed portions of the Works have been made available on the Internet through persons other than Lerma, with the potential for downloading by countless users.

The Works posted by Lerma were publicly available as part of an unsealed public court record in the Central District of California in *Church of Scientology International v. Fishman,* No. CV 91–6426 HLH (Tx), C.D.Cal. Wollersheim testified copies of the Works in his possession were sent to him by an attorney representing defendants in that case for whom he had provided consulting services.

In August 1995, reporters of the Washington Post obtained copies of the Works from the unsealed *Fishman* file. The newspaper's publication of portions of the materials

prompted RTC to request injunctive relief in *Religious Technology Center v. Lerma,* 897 F.Supp. 260 (E.D.Va.1995). On August 30, 1995, that court found the materials had escaped into the public domain and onto the Internet and that Lerma was not their only source on the Internet. *Id.,* 897 F.Supp. at 266–67 (E.D.Va.1995). The court concluded RTC could not establish for the purpose of the preliminary injunction motion that the documents were "not generally known" as required by the Virginia statute.

In the course of the hearing before me, RTC changed its position with regard to what materials constitute the purported trade secrets. At the outset, RTC maintained the entire Works were trade secrets. After evidence was heard indicating that the Works were in the public domain, RTC claimed that only portions of the Works, rather than the whole were secret. RTC's ambivalence and admission as to the non-secret nature of certain portions of the Works casts some doubt on the secret status of Works as a whole.

The evidence showed the Works are widely known outside of the Church through multiple sources. As such, they are not secret within the meaning of the Colorado statute and RTC has not shown a substantial likelihood of success on the merits of its trade secrets claim.

### B. *Irreparable Harm.*

■ I do not find RTC will suffer irreparable harm if the broad injunction sought is not granted. There has been no showing that RTC has lost nor will lose competitive advantage through Defendants' fair use of the Works, nor that such use has been for commercial purpose.

RTC claims use of the materials impedes its right to exercise its religious belief that the materials must be kept secret. I am not persuaded that a denial of the injunction sought will deprive followers of the Church of their freedom to exercise their religious beliefs. RTC effectively requests that I advance its religion at the expense of Defendants' lawful rights to use the materials for the purposes of criticism and research. The United States Constitution, common law and

the Copyright Act preclude me from doing so.

### C. *Balancing of Hardships.*

■ The evidence does not reflect that the threatened injury to RTC outweighs the damage the broad injunction sought may cause the Defendants. Such relief would effectively pull the plug on Defendants' electronic library, infringe not only on their rights of criticism and research but be the death knell of FACTNET. Any threatened injury to RTC is outweighed by this potentially devastating hardship to Defendants.

### D. *Public Interest.*

[16] Public interest lies with the free exchange of dialogue on matters of public concern. The injunction sought would silence the Defendants as participants in an ongoing debate involving matters of significant public controversy. Relief of this kind does not serve the public interest.

### IV. *Conclusion.*

Having weighed all the relevant factors, I conclude RTC has not shown a substantial likelihood of success on the merits and the balance of harms weighs in favor of Defendants. Accordingly, IT IS ORDERED THAT Plaintiff's motion for preliminary injunction is DENIED;

IT IS FURTHER ORDERED THAT Plaintiff is to return and restore to Defendants immediately and at Plaintiff's expense all seized materials in the condition they were when taken and to the precise places from which they were taken;

IT IS FURTHER ORDERED THAT Defendants are to maintain the status quo as to their possession of all copyrighted materials at issue in this case and are restricted to making only fair use thereof. Defendants are prohibited from making any additional copies of the materials or transferring them in any manner or publicizing them other than in the context of fair use.