**RELIGIOUS TECHNOLOGY CENTER, Plaintiff,**

v.

**Arnaldo Pagliarina LERMA, Digital Gateway Systems, The Washington Post, Marc Fisher, and Richard Leiby, Defendants.**

Civ. A. No. 95–1107–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 29, 1995.

Bruce B. McHale, Alexandria, VA, for Religious Technology Center.

Jay Ward Brown, Washington, DC, for Arnaldo P. Lerma.

Michael A. Grow, Washington, DC, for Digital Gateway Systems.

John P. Corrado, Alexandria, VA, for The Washington Post, Marc Fisher, and Richard Leiby.

*MEMORANDUM OPINION IN SUPPORT OF ORDER OF SEPTEMBER 15, 1995 AND AMENDED ORDER OF NOVEMBER 29, 1995*

BRINKEMA, District Judge.

This matter comes before the Court on plaintiff Religious Technology Center's ("RTC") Emergency Motion for Reconsideration and Rehearing of RTC's Motion for Temporary Restraining Order and Preliminary Injunction against defendants The Washington Post, Marc Fisher and Richard Leiby (collectively, "The Post"), plaintiff RTC's Motion for a Preliminary Injunction against defendant Lerma and Digital Gateway System ("DGS") and defendant Lerma's Motion to Vacate the August 11, 1995 Writ of Seizure and Order for Impoundment and to Increase the Amount of Plaintiff's Bond. On September 15, 1995 we denied all of RTC's motions and granted Lerma's motion. The memorandum to support that ruling was deferred.

## I. RTC'S EMERGENCY MOTION FOR RECONSIDERATION AND REHEARING ON RTC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS THE WASHINGTON POST, MARC FISHER AND RICHARD LEIBY

■ At the outset, we caution counsel that this Court seldom revisits motions upon which it has already ruled. Such an approach fosters efficiency and finality. A reconsideration motion is typically heard only where the Court has "patently misunderstood a party" or where there is a "significant change in the law or facts" of a case. *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983). Although neither circumstance is present here, the Court has permitted reargument because the RTC claims that the Court's denial of its Temporary Restraining Order has significant First Amendment implications upon which the RTC had not focused in its first motion. In the Court's view, these arguments should have been raised in RTC's original motion against The Post instead of awaiting this second attack. Nevertheless, in the interests of full consideration of RTC's claims, we granted the rehearing confident that RTC's future pleadings will address all significant legal issues in the first instance.

### A. The Free Exercise Clause

■ The most potent new issue raised by the RTC concerns the alleged interference that the Court's August 30 Order ("the Order") wreaks upon the free exercise of the Scientology religion. RTC asserts that

maintenance of the secrecy and confidentiality of the documents in question ("AT documents") represents a fundamental and inviolate tenet of the Scientology religion. Withholding these documents from unprepared or uninitiated observers was of primary importance to founder L. Ron Hubbard and is a belief woven throughout his original writings. Thus, for Scientologists publication of these materials threatens "irreversible alteration of religious beliefs, including compelled annihilation of a core belief—confidentiality of the [AT documents]." (RTC's brief at p. 17)

The RTC asserts that the Court's Order by permitting The Post limited and specified use of the AT documents "imposes a change in religious belief and practice by judicial fiat ... [It] dictate[s] to Scientologists how to practice their religion." (RTC's brief at p. 5) The Court thereby places in the hands of The Post "the authority to decide how the Scientology religion is practiced." (RTC's brief at p. 14) "Publishing is a literal violation of ... the very religious beliefs in question." (RTC's brief at p. 17) The RTC further argues that by denying their request to enjoin The Post and impound all AT documents in The Post's possession, this Court is placing its imprimatur on activity which represents "sacrilege" to the religion and "does violence to everything [Scientologists] believe in ..." (Transcript of September 15, 1995 Hearing at p. 15)

We recognize that the RTC has installed extraordinary measures to maintain the secrecy of its AT documents and that they have zealously pursued any reported leaks of information. However, it is a quantum leap to claim that Scientology's endeavors to enforce the secrecy of these documents thereby prohibits secular organizations from undertaking legally permissible criticism of Scientology including quotes from these documents as long as possession of the documents was achieved lawfully. In their effort to enjoin The Post, the RTC is essentially urging that we permit their religious belief in the secrecy of the AT documents to "trump" significant conflicting constitutional rights. In particular, they ask us to dismiss the equally valid First Amendment protections of freedom of the press. Furthermore, RTC asks that we

allow the Free Exercise Clause to deflate the doctrine of fair use as embodied in the copyright statute, one of the very status laws upon which the RTC has based this lawsuit.

Were they arguing to a religious council placed within a theocratic government, RTC's arguments might prevail. But this Court is a secular branch of a secular democratic government. Our traditional separation of church from the state, combined with the heterogeneity of religious practices in this country compel us to reject the RTC's arguments. "While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs." *Wallace v. Jaffree,* 472 U.S. 38, 57, 105 S.Ct. 2479, 2490, 86 L.Ed.2d 29 (1985). In the same vein, RTC may not employ the machinery of this Court to enforce its religious prescriptions against The Post by enjoining otherwise permissible activity.

■ Ultimately this Court must weigh any religious claims against the overriding necessity of enacting neutral and general laws to promote the common good. In evaluating the clash of these principles, the judiciary must honor legitimate secular goals. Activities that are otherwise permissible cannot be prohibited on the ground that they offend another individual's religious culture or sensibilities. The Supreme Court stated this point cogently in *Employment Division, Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 885, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876 (1990):

The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, *'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'* To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs ...—permitting him, by virtue of his beliefs, 'to become a law unto himself,'—contradicts both constitutional tradition and common sense.

(emphasis added) (citations omitted). The opinion concludes:

> The rule respondents favor would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind.

*Id.* at 888–89, 110 S.Ct. at 1605.

■ It is well-established that a law satisfies the requirement of the Free Exercise Clause if it is "neutral" and of "general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, —— et seq., 113 S.Ct. 2217, 2226 *et seq.*, 124 L.Ed.2d 472 (1993).[1]

RTC responds that their claims merit additional weight because the secrecy of the AT documents is a necessary condition to the operation of Scientology. In other words, dissemination of the confidential materials threatens to decimate the religion as opposed to merely offending Scientologists, consequently, inhibiting their free exercise of their religion. The RTC supports this argument with the affidavits of various Scientologists. Despite these affidavits, it would be inappropriate and beyond our capability to assess the degree of importance which such confidentiality has in the Scientology religion:

> It is no more appropriate for judges to determine the "centrality" of religious beliefs ... in the free exercise field, than it would be for them to determine the "importance" of ideas ... in the free speech field. What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is "central" to his personal faith?

*Dept. of Human Resources of Oregon v. Smith*, 494 U.S. at 886–87, 110 S.Ct. at 1604.

The RTC attempts to analogize the Court's Order to "an order compelling a Protestant to dispute the Resurrection, ordering a fundamentalist to read the Bible [non-literally], compelling an observant Jew to eat pork, or compelling an observant Catholic to have an abortion." (RTC's brief at p. 5) This analogy fails because in each hypothetical the judiciary is forcing an affirmative action upon the religion member. However, the instant case is distinguishable because the Court, by upholding neutral copyright and First Amendment law is not compelling any Scientologist to do anything. Instead, the Order merely permits The Post to utilize the AT documents within the limits of the fair use exception to the copyright law. In effect, all the Order allows is the continued operation of established secular law in the neutral fashion for which it was intended.

**B. Spiritual Harm**

■ A second related argument regards the alleged spiritual harm that will befall Scientologists and non-Scientologists alike from reading the AT documents. The RTC claims that premature exposure of the documents to non-Scientologists (and even to Scientologists who have not reached the requisite OT level) will result in "devastating, cataclysmic spiritual harm." (RTC's brief at p. 34) "According to the church's dogma, founder L. Ron Hubbard taught that disclosure of these documents to anyone who had not progressed through the necessary spiritual prerequisites could cause profound spiritual harm to the person prematurely exposed." (Third McShane Declaration, pp 2–3) Non–Scientologists will also be harmed because premature exposure will interfere with their "personal spiritual progress." *Id.* p. 11.

This argument has no merit. We reside in a country which allows individuals and organizations to confront the risk of harm, spiritual or otherwise, in the face of protected speech. The First Amendment represents a conscious and explicit trade-off which the Founding Fathers made between paternalistic protection from "harmful" thoughts and free access to information. Where statutorily and constitutionally protected speech is

---

**1.** Using the formula detailed in *Lukumi Babalu*, the Supreme Court has repeatedly upheld other secular activities that conflicted with a petitioner's religious beliefs. *See e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (permitting government logging and road construction on lands used for religious purposes by Native Americans); *Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (upholding the assignment of a social security number despite petitioner's claim that it violated religious beliefs).

1358

concerned, our system permits an individual's fate to be sealed by the individual's choices rather than governmental monitoring.

The RTC states that "violations of intellectual property rights are *not* protected speech within the meaning of the First Amendment." (RTC's brief at p. 23, emphasis in original). However, this Court has already ruled that the excerpts appearing to date in The Post constitute fair use under the copyright statute, and are thus not "violations." We have encountered no evidence to alter that decision.

In addition to individuals, the RTC also argues that release of the AT documents could wreak destruction on a planetary scale. One Scientologist describes how dissemination of the documents might "let loose a hurricane upon the world through our materials coming into unethical or suppressive or psychiatric hands ... To place this data near such people as psychiatrists or even states, places them in a position to enslave people ..." (RTC's brief at p. 12)

This argument is merely another version of the RTC's first argument. It asks this Court to accept as truth what is a religious belief of Scientologists and to make a finding of irreparable harm based on such acceptance. That is not a proper basis upon which a secular court can base a judicial decision.

For the foregoing reasons, the addition of RTC's free exercise argument does not warrant reversal of our previous denial of the motion for temporary restraining order and preliminary injunction against The Post.

**C. Economic Harm and Prior Restraint**

■ In addition to spiritual harm, RTC's Emergency Motion reargues their position about economic harm from publication of the AT documents. RTC bases its economic claims upon two types of harm:

1) Competition from rival churches or "splinter groups" which will draw away future parishioners and potential donations (RTC's brief at pp. 24–43); and

2) The "potential loss of new parishioners through ridicule, by taking portions of the materials out of context." (RTC's brief at p. 16)

As to the first claim, no reasonable person could find that The Post's brief quotations from the AT documents could provide sufficient material upon which a rival church could establish a competing organization. As The Post has argued, there is no evidence that it intends any more extensive quotations, and indeed they are under court order to confine their use of the documents to that permitted by fair use. Moreover, The Post is clearly not in the business of setting up religions and is not a competitor of Scientology.

Regarding the RTC's concern about potential loss of new parishioners, this is the price paid in a free society which encourages an open marketplace for ideas. Free speech protections and the fair use exemption to the copyright statute exist to permit open and educated debate on matters of public importance. The RTC must accept the fact that a frank criticism of Scientology religious tenets may deter some potential parishioners. Harm from legitimate criticism is not actionable under either the First Amendment or the copyright laws. *New Era Publications Int'l v. Carol Publishing Group*, 904 F.2d 152, 160 (2nd Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990).

Thus, the additional arguments presented by RTC regarding alleged economic harms are unconvincing, and are insufficient to alter the *Blackwelder* analysis which prompted this Court's denial of their original motion.

No other arguments in the RTC brief merit any further discussion because they either merely repeat previous arguments or express disagreement with our previous ruling. Based on the foregoing, RTC's Emergency Motion for Reconsideration and Rehearing is DENIED.

**II. RTC'S MOTION FOR PRELIMINARY INJUNCTION AGAINST LERMA AND DGS AND LERMA'S MOTION TO VACATE THE WRIT OF SEIZURE AND INCREASE THE AMOUNT OF PLAINTIFF'S BOND**

■ The analysis we made concerning The Post is also relevant to RTC's request for

preliminary injunction against Lerma and DGS as well. Whether a preliminary injunction should be issued "is determined by the 'flexible interplay' of four factors: the risk of irreparable harm to the plaintiff if relief is denied, the risk of harm to the defendant if relief is granted, the likelihood of the plaintiff's success on the merits, and the interest of the public." *Religious Technology Center v. Lerma,* 897 F.Supp. 260, 262 (E.D.Va.1995) (quoting *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 196 (4th Cir.1977)) ("Order").

■ Several of the conclusions we reached regarding The Post are applicable to Lerma. First, we find that the RTC has not made a strong showing of irreparable harm if the injunction is not granted. Lerma has agreed to abide by the same court order as has been imposed against The Post. Specifically, he has agreed to be bound by the fair use provisions of the copyright law and he has agreed not to transfer the AT documents to anyone.

■ Second, the First Amendment's protection of the freedom of the press extends to individuals and groups in addition to commercial news organizations such as The Post. As a result, Lerma would also suffer irreparable harm from the prior restraint which would result from a grant of the injunction. "[L]iberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods." *Branzburg v. Hayes,* 408 U.S. 665, 704, 92 S.Ct. 2646, 2668, 33 L.Ed.2d 626 (1972).

Rather than publishing in a newspaper, Lerma has used the Internet, which is rapidly evolving into both a universal newspaper and public forum. And although the law has not yet decided how to deal with the Internet, it is certain that this form of communication will retain First Amendment protections. Thus, the method of Lerma's publications and the size of his audience are not reasons for treating him differently from The Post under the *Blackwelder* test.

Up to this point, therefore, our analysis and conclusions are the same as those we reached in the RTC's case against The Post. However, on the likelihood of success on the merits, the balance tips somewhat more in RTC's favor because of the degree and surrounding circumstances of Lerma's publications on the Internet. This Court earlier held that The Post's limited use of brief quotations amidst extensive original commentary surrounding a newsworthy event clearly fell within the "fair use" exception of the copyright statute. *See Religious Technology Center v. Lerma,* 897 F.Supp. 260, 263 (E.D.Va.1995). Lerma's use of the AT documents is more extensive than The Post's and may not constitute fair use. The RTC provided numerous examples of AT Documents or segments thereof copied from Lerma's computer. These excerpts often constitute much larger quotations from the AT documents than those found in The Post article. *See* RTC's Under Seal Exhibit Binder from the September 15, 1995 Hearing. They sometimes represent wholesale copying of a distinct segment or bulletin from allegedly copyrighted documents. Most importantly, they appear at times to have been copied without any comment or criticism whatsoever.

Lerma objected to the introduction of these exhibits because a copy had not been provided to counsel before the hearing. Lerma argued that in discovery he had asked for just such a comparison; he claimed to be at a disadvantage because of surprise. The Court quickly reviewed defendant's discovery requests, found they did not include an explicit request for this comparison and then reviewed the exhibit. On this preliminary review, we conclude that Lerma's copying and publishing appears more extensive than The Post's and, therefore, that the likelihood of RTC succeeding on the merits of the copyrighted infringement claim is somewhat higher than in its case against The Post.

However, as much as this Court may be concerned about Lerma's use of the AT documents, it is even more troubled by issues raised in Lerma's Motion to Vacate. Lerma argues that the RTC cannot avail itself of the equitable power of the Court because it has unclean hands. Specifically, he attacks: 1) the bona fide intentions of RTC in bringing

this lawsuit; and 2) the manner in which the RTC has handled the materials seized from his home on August 11, 1995.

When the RTC first approached the Court with its *ex parte* request for the seizure warrant and Temporary Restraining Order, the dispute was presented as a straight-forward one under copyright and trade secret law. However, the Court is now convinced that the primary motivation of RTC in suing Lerma, DGS and The Post is to stifle criticism of Scientology in general and to harass its critics. As the increasingly vitriolic rhetoric of its briefs and oral argument now demonstrate, the RTC appears far more concerned about criticism of Scientology than vindication of its secrets. RTC's Emergency Motion for Reconsideration, discussed above, is a clear example of this conduct.

■ In that motion, the RTC maligns the "incorrect premise that a newspaper has a 'right' to report on the *content of,* let alone quote from, confidential, unpublished materials." Emergency Motion at p. 33 (emphasis added). This is not an incorrect premise. Whether or not the extent of The Post's or Lerma's quotations exceed fair use, it is beyond dispute that general discussion of and reporting about the "contents" of any work is permissible. The Copyright Act itself provides:

> In no case does copyright protection for an original work of authorship extend to any idea ... system ... concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C.A. § 102(b). The "idea/expression" distinction in copyright law is a critical balance which allows a flourishing exchange of ideas while still protecting a particular author's expression of that idea. The RTC's position appears to be an attempt to silence comments about the *ideas* of Scientology and not just the particular expression of those ideas.

The RTC claims that "The *Post's* motivation is not so mild. That its intention in copying the documents from the court file is vicious is underscored by the contents of the article itself." *Id.* at p. 35. The Post's use of AT Document quotations was quite minimal,

as this Court earlier held. The "contents" to which the RTC so vigorously objects, therefore, appear to be adverse discussion and criticism of Scientology and this related litigation. Although the RTC may attempt to argue that "any public interest in obtaining information through media sources ... does not supersede the rights of a copyright owner," Emergency Motion at p. 44, copyright law, the First Amendment, and the fair use doctrine prove this is not always the case.

This theme is also demonstrated at oral argument. There were numerous times when counsel for RTC strayed into issues far beyond the scope of copyright or trade secret law and were more akin to an objection to criticism of Scientology. *See e.g.,* Transcript of September 15, 1995, p. 12 (RTC is concerned about "broadside attacks on the religious practices of Scientology, broadside attacks on the Scientology and Scientologists"); p. 16 (the reason the AT Documents are being exposed "is to offend [the] sensibility [of Scientologists], to offend [their] conviction[s]. These are spiteful revelations that are being made. These are not being made by anybody in the interest of news."); pp. 20–21 ("The Church of Scientology has to come in here and has to be confronted with The Washington Post claim that it has the right to get those files ... and that their rights are superior ... to the core of religious convictions and belief of every Scientologist everywhere ..."); p. 24 (that The Post published certain quotes— quotes to which RTC makes no copyright or trade secret claim—in order to "be offensive to Christians everywhere ... it's just a vicious, disgusting attack on Jesus Christ made up for that purpose."); p. 25 (that The Post published some of this "phony" material "to try to cut the lines of Scientology to their co-religionists in the Christian religion around the world. It was a vicious thing to do."); p. 25 (that "the attack on the religious beliefs and practices of Scientology is absolutely repugnant to the Constitution and ought not to be allowed to stand. [The Post has] mowed down [RTC's] rights with the phony exercise of their own."); pp. 29, 30, 31 (where RTC makes reference to other "attacks" unrelated to any copyright infringe-

ment). These repeated excursions into concerns about attacks on Scientology and its followers, excursions which the Court had to reign in, reinforce our earlier mentioned concerns regarding the bona fides of this case. Had the Court been aware of the true motives behind this litigation, it might not have granted the RTC's initial *ex parte* motions for a Temporary Restraining Order and to permit a seizure of Lerma's property.

The Court's concern is further heightened by the manner in which Lerma's computer files were seized and subsequently searched. There has been extensive briefing and argument by all parties on their varying interpretations of the seizure and search order. Regardless of RTC's attempt to interpret and the wording of the seizure order, it was this Court's understanding that Lerma's property would be turned over to an "independent" computer expert who would conduct independent searches based upon a limited set of search indicia. At the *ex parte* hearing the Court expressed concern that the downloading of Lerma's information might reveal personal and confidential information irrelevant to this case. (Transcript of Hearing, August 11, 1995 at pp. 14–15.) This independent review was offered as a safeguard against potential abuse. We are greatly disturbed to learn that the scope of RTC's involvement clearly exceeded our intentions for the search. Specifically, we now know that counsel for RTC determined *ex parte* what materials would be subject to impoundment based upon judicial authority.

Moreover, Lerma has effectively demonstrated that—as a direct result of the seizure and RTC's involvement in the searching—the RTC has acquired confidential information of great import to them and of secondary (at best) relevance to this litigation.

We decline to find that RTC's participation in the search and seizure rises to the level of a "fraud on the Court" as Lerma might have us believe. However, we do conclude that RTC violated the spirit if not the letter of the seizure writ, and misled the Court as to the way in which the Lerma materials were maintained and reviewed.

## Conclusion

We therefore conclude that this problem of unclean hands on the part of RTC mandates denial of the equitable relief they presently seek against Lerma and DGS. Even without unclean hands, however, the RTC would lose under the *Blackwelder* test. The RTC is currently undertaking virtually identical litigation in the United States District Court for the District of Colorado involving FACTNet, Lerma's organizational counterpart. That case involves the same issues and some of the same parties and facts as the instant action. After three days of hearings on parallel motions filed by the parties in that jurisdiction, and using a balancing test identical to that found in *Blackwelder,* Judge John L. Kane, Jr. denied RTC's Motion for Preliminary Injunction, granted the defendants' Motion to Vacate the Seizure Order, and ordered immediate return of all the materials. *See Religious Technology Center v. F.A.C.T.NET, Inc.,* 901 F.Supp. 1519 (D.Colo.1995). We garner additional support for our conclusion from this decision.

For the reasons mentioned above, RTC's Motion for Preliminary Injunction against defendants Lerma and Digital Gateway Systems is DENIED and defendant Lerma's Motion to Vacate the Writ of Seizure is GRANTED. Because a stay of this ruling would, in effect, leave Lerma in the same enjoined condition from which the Court has now found he should be released, RTC's Motions for Provisional Stays are DENIED.

### AMENDED ORDER

The September 15, 1995, Order inadvertently omitted defendant, Digital Gateway Systems ("DGS"). For this reason, that Order is hereby amended to reflect that the Religious Technology Center's ("RTC") Motion for a Preliminary Injunction is DENIED against both DGS and Lerma.

For the reasons stated in open Court and in the Accompanying Memorandum Opinion,

Plaintiff Religious Technology Center's Emergency Motion for Reconsideration and Rehearing and

Motion for a Preliminary Injunction Against Defendants Lerma and Digital Gateway Systems are DENIED.

Defendant Lerma's Motion to Vacate the Writ of Seizure and Order for Impoundment is GRANTED and it is hereby

ORDERED that RTC shall immediately return and restore to Defendant Lerma all seized materials in their exact original condition. This includes both Lerma's hard drives and all floppy disks; and it is further

ORDERED that Defendant Lerma shall maintain the status quo as to possession of all the allegedly copyrighted materials at issue in this case and is restricted to employing them only in a fair use capacity. Lerma and his counsel are specifically prohibited from making any additional copies of the materials or transferring them in any manner or publicizing them other than in the context of fair use.

This action moots the issue of increased bond relating to the seizure, so Defendant Lerma's Motion to Increase Bond is DENIED.

Plaintiff RTC's Motions for Provisional Stays Pending Appeal to the Fourth Circuit are DENIED.